**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DOE 1, DOE 2, and DOE 3,
c/o Dickinson Wright PLLC
1825 I Street, N.W., Suite 900
Washington, D.C. 20006
[addresses of record withheld pending ruling on Plaintiffs' Motion for Leave to Proceed Under Pseudonyms],

Plaintiffs,

v.

PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD,
1666 K Street, N.W.
Washington, D.C. 20006,

Defendant.

Civil Action No. 1:26-cv-3873

**COMPLAINT FOR DECLARATORY JUDGMENT**

## INTRODUCTION

1. This is a statutory case about two limits Congress placed on the investigative power of the Public Company Accounting Oversight Board (the "Board" or "PCAOB"). First, Congress authorized the Board to require testimony and the production of existing documents and information in a witness' possession. 15 U.S.C. § 7215(b)(2)(A)-(B). It did not authorize the Board to compel a witness to create new documents. Second, Congress authorized sanctions against a person who "refuses to testify, produce documents, or otherwise cooperate." *Id.* § 7215(b)(3). It did not authorize sanctions for a witness' objection to conditions that Congress never authorized. The Board, through its Division of Enforcement and Investigations ("Division" or "DEI"), has crossed both lines. It has ordered three accountants who live in Country X, in Southeast Asia, to create, sign, and deliver written certifications that productions reaching every email, text, Microsoft Teams, and WhatsApp message of a 30-to-40-person firm are complete, and to complete and sign a 17-item background questionnaire under a declaration invoking the Board's noncooperation rule. The Board, through DEI, has ordered the same accountants to fly more than 9,000 miles to Washington, D.C., at their own expense, at an out-of-pocket cost of $18,000 to $22,000 each before counting lost time from work. And DEI holds open over their heads the threat to brand them as "noncooperating," and end their careers, if they object. Worse still, the staff member who issued these demands is not a government officer at all, nor for that matter is any other person employed by DEI. Congress provided expressly that no "person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service." 15 U.S.C. § 7211(b). Private employees of a nonprofit corporation, accountable to no officer of the United States, have imposed requirements that neither the Act nor any Securities and Exchange Commission-approved rule authorizes. The result is compulsion without accountability.

2. *Congress authorized testimony and existing documents, not the compelled creation of new ones.* Section 105(b)(2) of the Sarbanes-Oxley Act of 2002 authorizes the Board to "require the testimony" of a registered firm or associated person and to "require the production" of documents and information "in the possession of" that firm or person. 15 U.S.C. § 7215(b)(2)(A)-(B). The text draws a clear line. The Board may compel a witness to testify, under the procedures its rules prescribe for testimony, and may compel a witness to produce what the witness already possesses. The Board may not compel a witness to manufacture a new document. A certification that does not exist until the witness writes it, and a questionnaire that does not exist until the witness completes it, are neither testimony nor documents "in the possession of" anyone. Even the consents Congress required of every registered firm and its personnel run to "any request for testimony or the production of documents," and nothing more. *Id.* § 7212(b)(3). The practice of the Board's congressionally designated overseer, the Securities and Exchange Commission ("SEC" or "Commission"), confirms the line: Commission staff may ask a witness to confirm that a production is complete or to complete a background questionnaire, but the Commission treats its background questionnaire as optional, and it cannot compel a witness to create either document.

3. *Congress authorized sanctions for refusal, not for disagreement over unlawful conditions.* Section 105(b)(3) permits sanctions against a person who "refuses to testify, produce documents, or otherwise cooperate." 15 U.S.C. § 7215(b)(3). The operative word is "refuses." Plaintiffs have refused nothing. Plaintiffs have offered to testify by videoconference or in person in Country X, and they have produced, and will continue to produce, the documents in their possession, custody, or control. What Plaintiffs decline is to manufacture new documents and to fund their own compelled travel, conditions that Congress never authorized. No provision of the Act authorizes the Board to require a witness to finance the witness' own compelled appearance,

whether across the country or across the world. When Congress wanted the Board to collect money from regulated persons, it said so and specified how: registration and annual fees, accounting support fees, and civil money penalties imposed only after a hearing. Federal law has long required payment of witness fees and travel expenses when attendance is compelled. 28 U.S.C. § 1821; 5 U.S.C. § 503(b). Witnesses compelled to appear before the Commission are entitled to statutory attendance fees and travel reimbursement, while the Commission directs its investigative demands toward testimony and the production of existing documents.[1] The Board's own rules likewise require the summoning party to pay a compelled witness' travel and subsistence expenses at Board hearings. PCAOB Rule 5424(a)(4). An objection to conditions that no statute or rule authorizes is not a refusal to testify, and Congress did not make it sanctionable.

4. *The Board nevertheless has imposed requirements Congress never authorized and has threatened to punish objections as noncooperation.* The accounting board demands, that Board staff served on Plaintiffs, command each of them to deliver, by November 4, 2026, unqualified written certifications that all documents responsive to four Board requests and demands have been produced, and a completed background questionnaire, signed under a declaration invoking the Board's noncooperation rule, that seeks such information as the high school each Plaintiff attended and the names and ages of each Plaintiff's minor children. The same demands command Plaintiffs to appear in Washington on multiple dates between December 2 and 17, 2026. Board staff tendered nothing and refused both videoconference testimony and testimony where Plaintiffs live. The

[1] Federal law has long provided that witnesses compelled to attend governmental proceedings are entitled to statutory attendance fees and travel reimbursement. *See* 28 U.S.C. § 1821; 5 U.S.C. § 503(b). Congress extended that principle to administrative proceedings by providing that witnesses subpoenaed to agency hearings receive the same attendance fees and mileage allowances available to witnesses in federal court. 5 U.S.C. § 503(b). Consistent with that statutory framework, witnesses compelled to appear before the SEC are entitled to statutory attendance fees and travel reimbursement. See 17 C.F.R. § 201.232(f). The SEC's investigative authority, moreover, is directed toward obtaining testimony and existing documents; that authority generally does not compel witnesses to prepare analyses, compilations, summaries, or other new materials for the government's benefit. *See* 15 U.S.C. § 78u(b); 17 C.F.R. pt. 203.

reason staff gave, that "the documents are here," is not true: all original documents, and every original source electronic device on which they were created and kept, are in Country X. Asked what would happen to witnesses without U.S. visas, as two of the three Plaintiffs are, the responsible Associate Director of DEI cited no statute, rule, policy, or precedent, only anecdotes attributed to "users on Reddit." The Board's own enforcement form warns that failing to comply with any demand, or "knowingly making any false material declaration," is sanctionable noncooperation. Plaintiffs therefore must certify or be charged, complete the questionnaire or be charged, and pay or be charged, and a certification the Board later deems incomplete could become a charge of its own.

5. *The Court should resolve these legal questions now, before sanctions attach.* No Board rule permits a witness to obtain judicial review of a Board demand before the date for compliance. The only route to review runs through refusal, an expedited noncooperation proceeding with a five-day answer deadline, and a potential lifetime bar from the profession. That is precisely the "bet the farm" choice the Supreme Court refused to impose on parties challenging this same Board. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490-91 (2010) ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law."). It is troubling enough when a government officer makes non-negotiable demands for records and testimony that can be challenged only by first incurring sanctions. Even in that setting, the subject of an administrative search "must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015). The concern is even greater here, where Congress specified that the Board's personnel are not "officers or employees" of the Federal Government, 15 U.S.C. § 7211(b), yet the Board asserts authority to compel production, compel testimony, and threaten professional ruin before

any court has considered the legality of its demands. Whether Congress authorized the Board to compel the creation of new documents, to treat objections to unauthorized conditions as noncooperation, and to require witnesses to fund their own compelled travel are pure questions of statutory interpretation. Those questions are for this Court to decide independently, without deference to the Board. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024). Their resolution requires no factual development concerning any audit and no inquiry into the merits of the Board's investigation.

6. The Board's conduct is unlawful for additional, independent reasons. The Board has drawn Plaintiffs into the United States regulatory system as a condition of their profession, and having done so, the Board must afford them the process the Fifth Amendment guarantees. A procedure that forces witnesses to fund their own compelled appearances, stakes their careers on consular visa decisions that the Board cannot control and no court can review, and supplies no neutral check before ruinous sanctions attach is fundamentally unfair, whatever authority the Board may claim. And because the Board is a governmental entity, its demands also are reviewable, and unlawful, under the Administrative Procedure Act. Plaintiffs plead those claims in the alternative. The Court need not reach them. It can grant Plaintiffs complete relief on the statutory text alone.

7. Plaintiffs do not seek to avoid testifying or to withhold documents. They recognize the expectation that they testify, and they have produced and will continue to produce responsive documents in their possession, custody, or control. Plaintiffs simply seek a declaration that the Board may not demand or obtain written certifications that productions are complete, or compel Plaintiffs to complete and sign background questionnaires; a declaration that objecting to those conditions, and to self-funded travel, is not a refusal "to testify, produce documents, or otherwise

cooperate"; a declaration that the Board may not compel Plaintiffs' in-person attendance in the United States unless DEI staff takes Plaintiffs' testimony during regular business hours in their home country, either by the remote means its own rules allow or in person where they live, or tenders in advance the fees and allowances federal law guarantees every compelled witness; and a declaration that the Board may not institute noncooperation proceedings premised on Plaintiffs' objections. The questions presented recur in every Board investigation in which DEI compels witnesses to travel at their own expense, whether across the United States or from abroad, and in every investigation in which DEI demands certifications or questionnaires. They warrant a definitive answer and judicial resolution by declaratory judgment, which is the only relief Plaintiffs seek at this time. Plaintiffs do not contend that reimbursement is the only lawful course. The Board may take Plaintiffs' testimony by videoconference, take it in person in Country X, or pay the costs of the attendance it compels. Plaintiffs ask only that the Board choose one of those lawful options rather than shift the cost of its preference onto the witnesses.

8. To ensure clarity, the Board has not instituted any disciplinary proceeding against Plaintiffs. Nor has DEI communicated to Plaintiffs or to their accounting firm, through their counsel, that DEI intends to recommend any disciplinary proceeding. Upon information and belief, DEI has not yet taken any investigative testimony in its investigation. Also, upon information and belief, the accounting board's demands to Does 1, 2 and 3 for their investigative testimony, and to make certifications and complete questionnaires personally, are the first accounting board demands issued to any individual(s) associated with Plaintiffs' accounting firm in this investigation. DEI's earlier accounting board request and two accounting board demands were directed to the Plaintiffs' firm itself, not to any Plaintiff. Upon information and belief, this case therefore differs from every other prior action that a pseudonymous plaintiff has brought against

the Board. In each of those other cases, DEI either had recommended or the Board had instituted enforcement proceedings before the lawsuit was filed against the Board. Upon information and belief, this is the first such case brought in advance of any recommendation or institution of enforcement proceedings and before the commencement of any investigative testimony.

## PARTIES

9. Plaintiffs Doe 1, Doe 2, and Doe 3 (together, "Does 1-3" or "Plaintiffs") are natural persons who reside in Country X, a nation in Southeast Asia.[2] No Plaintiff is a citizen of the United States, ever has resided in the United States, or holds a U.S. professional license.

10. Plaintiff Doe 1 is a citizen of Country X. Doe 1 is a Chartered Accountant licensed in Country X and is the Managing Partner of a public accounting firm (the "Firm") organized under the laws of Country X and headquartered there. At all times relevant hereto, Doe 1 was, and continues to be, a partner of the Firm. Doe 1 has no visa to travel to the United States.

11. Plaintiff Doe 2 is a citizen of Country X. Doe 2 is a Chartered Accountant licensed in Country X. At all times relevant hereto, Doe 2 was, and continues to be, a partner of the Firm.

12. Plaintiff Doe 3 is a citizen of Country Y, on the Continent of Africa, and resides in Country X. Doe 3 is a Chartered Accountant with the Country Y Institute of Chartered Accountants. At all times relevant to the investigation, Doe 3 held the position of Manager with the Firm, and Doe 3 currently is a Director of the Firm. Doe 3 has no visa to travel to the United States.

---

[2]Plaintiffs proceed under pseudonyms pursuant to a motion for leave filed with this Complaint. Sarbanes-Oxley makes the Board's investigations confidential, 15 U.S.C. § 7215(b)(5)(A), and disclosure of Plaintiffs' identities would reveal the existence of a nonpublic investigation in which no charge has been brought, inflicting the very professional and reputational injury this action seeks to prevent. Similarly, Plaintiffs do not identify by name the Associate Director of the Division whose communications are central to this lawsuit.

13. The Firm is a small firm of between 30 and 40 employees. The Firm is registered with the Board as a "registered public accounting firm" and is a "foreign public accounting firm" within the meaning of Sarbanes-Oxley §§ 2(a)(12) and 106, 15 U.S.C. §§ 7201(a)(12), 7216(g). Each Plaintiff is a "person associated with" the Firm within the meaning of Sarbanes-Oxley § 2(a)(9), 15 U.S.C. § 7201(a)(9).

14. Defendant PCAOB is a nonprofit corporation created by Sarbanes-Oxley § 101 and organized under the laws of the District of Columbia. 15 U.S.C. § 7211(a)-(b). The Board possesses only the powers that Congress conferred in 15 U.S.C. § 7201 *et seq.*. The Commission appoints the Board's five members and exercises oversight and enforcement authority over the Board. 15 U.S.C. §§ 7211(e), 7217(a). DEI conducts the Board's investigations. The Board maintains its headquarters at 1666 K Street, N.W., Washington, D.C. 20006.

15. The Board is a governmental entity. The Supreme Court decided *Free Enterprise Fund* on the parties' agreement that the Board is "part of the Government" for constitutional purposes. *Free Enter. Fund*, 561 U.S. at 485–86. The United States, intervening to defend the constitutionality of Sarbanes-Oxley, has argued to a federal court that the Board is a governmental entity. *See* Mem. of Law of the United States at 9, *John Doe Corp. v. Pub. Co. Acct. Oversight Bd.*, No. 4:24-cv-1103 (S.D. Tex. July 26, 2024), ECF No. 35. And on September 30, 2026, this Court recognized that "for purposes of [its] analysis, the Board is a government entity subject to the same constraints as administrative agencies." *Doe v. Pub. Co. Acct. Oversight Bd.*, No. 1:24-cv-780, slip op. at 17 (D.D.C. Sept. 30, 2026) (*citing Free Enter. Fund*, 561 U.S. at 510).

## JURISDICTION AND VENUE

16. This action arises under the laws and Constitution of the United States, including the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or the "Act"), 15 U.S.C. § 7201 *et seq.*, and the Fifth Amendment. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

17. Plaintiffs' statutory claims (Counts I through IV) invoke the Court's long-recognized authority to review, and to declare unlawful, action by entities exercising federal power in excess of the authority Congress conferred. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *Free Enter. Fund*, 561 U.S. at 491 n.2; *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996). That authority does not depend on the Administrative Procedure Act. The Board, moreover, is a corporation whose powers are limited to those its enabling statute confers, and acts beyond those powers are subject to judicial review. The Court may grant declaratory relief under 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 57, and "may order a speedy hearing of a declaratory-judgment action." Fed. R. Civ. P. 57. A declaration will redress Plaintiffs' injuries: the Board, as a party bound by the judgment, would be expected to conform its demands and any noncooperation proceeding to an authoritative court declaration of the Board's statutory authority. See *Utah v. Evans*, 536 U.S. 452, 463–64 (2002); *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion). In the alternative, the Court may grant relief under the Administrative Procedure Act, 5 U.S.C. §§ 702-706, which also waives any immunity the Board may assert from a suit seeking relief other than money damages. 5 U.S.C. § 702.

18. Review of Plaintiffs' statutory claims is available under the standards that govern non-statutory review of action in excess of delegated authority. *See Nuclear Regul. Comm'n v. Texas,* 605 U.S. 665, 681 (2025) (explaining that nonstatutory review is available only where an

agency "has taken action entirely in excess of its delegated powers and contrary to a specific prohibition" and where no statutory review scheme provides a "meaningful and adequate opportunity for judicial review") (internal quotation marks omitted). First, the Act's review scheme affords Plaintiffs no meaningful and adequate opportunity for judicial review of these demands: it reaches only final Board disciplinary sanctions, and Plaintiffs could only obtain review by refusing, being charged, and being sanctioned. Second, the Board has acted entirely in excess of its delegated powers and contrary to specific statutory limits: Congress enumerated the Board's compulsory investigative powers as testimony and production of documents "in the possession of" the witness, 15 U.S.C. § 7215(b)(2), enumerated the Board's sources of revenue, *id.* §§ 7212(f), 7219, and confined noncooperation sanctions to refusals "to testify, produce documents, or otherwise cooperate," *id.* § 7215(b)(3).

19. Nothing in Sarbanes-Oxley or the Securities Exchange Act of 1934 ("Exchange Act") divests this Court of jurisdiction. The Act's review scheme channels to the Commission, and then to the courts of appeals for challenges to *final Board disciplinary sanctions*. 15 U.S.C. §§ 7215(e), 7217(c); 15 U.S.C. § 78y. The Supreme Court has held that this scheme does not bar district-court jurisdiction over claims a party could otherwise present to the Commission only by first incurring a Board sanction. *Free Enter. Fund*, 561 U.S. at 489-91; *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023). Under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), a statutory review scheme displaces district-court jurisdiction only where Congress' intent to do so is "fairly discernible in the statutory scheme," *id.* at 207 (citation omitted), and the claims are "of the type Congress intended to be reviewed within th[e] statutory structure," *id.* at 212. That inquiry asks whether "a finding of preclusion could foreclose all meaningful judicial review," whether the claims are "wholly 'collateral' to [the] statute's review provisions," and whether they fall "outside

the agency's expertise." *Id.* at 212–13 (citation omitted). Each consideration favors jurisdiction here. The Act's review provisions "provide[] only for judicial review of Commission action, and not every Board action is encapsulated in a final Commission order or rule." *Free Enter. Fund*, 561 U.S. at 490.

20. Plaintiffs' claims fall outside any implied channeling scheme for four independent reasons. *First*, no Board disciplinary proceeding against any Plaintiff exists, so there is no proceeding into which their claims could be channeled, and nothing in the Act or the Board's rules requires the Board ever to institute one. See Board Rule 5110(a) (Board "may institute" noncooperation proceedings). *Second*, the Board's rules provide no mechanism by which a witness may ask the Board, a hearing officer, or the Commission to require payment of witness expenses, to modify the place of testimony, or to excuse a demanded certification before the date to comply; the only path to any review runs through refusal, enforcement action, and sanction. *Third*, Plaintiffs' claims are wholly collateral to the merits of any investigation: they concern the limits of the Board's compulsory process, not whether any audit complied with professional standards. *Fourth*, the questions presented, the scope of the Board's statutory authority and the meaning of the Act's "fair procedures" mandate, are legal questions outside the Board's accounting expertise.

21. No provision of the Act or the Commission's Rules of Practice permit a witness to obtain Commission review of an accounting board demand, or a stay of one, before the Board imposes a final disciplinary sanction. The Commission's review jurisdiction extends to a "determination of the Board with respect to any final disciplinary sanction." 17 C.F.R. § 201.440(a); *see* 15 U.S.C. §§ 7215(e), 7217(c). The Commission's stay rule addresses only the automatic stay of such a sanction that follows an application for review. 17 C.F.R. § 201.401(e); 15 U.S.C. § 7215(e). And no Board rule permits a witness to move to quash or modify an

accounting board demand. Plaintiffs therefore have "no other means, within their control," to obtain review of the demands at issue. *Thunder Basin*, 510 U.S. at 213 (quoting *Leedom v. Kyne*, 358 U.S. 184, 190 (1958)).

22. Review is not merely deferred; whether it ever occurs lies entirely within the Board's discretion. In *Thunder Basin*, a mine operator that persisted in refusing to comply would have required the Secretary of Labor to issue a citation and commence enforcement proceedings, culminating in review by an independent commission and a court of appeals. 510 U.S. at 216. Here, by contrast, nothing requires the Board to institute a noncooperation proceeding at any time. Board Rule 5110(a). The Board may maintain its threat indefinitely, and Plaintiffs cannot compel it to act. The Act's review scheme thus provides no assured path to review of the Board's demands.

23. Compliance would itself inflict the injuries of which Plaintiffs complain, and compliance would foreclose review entirely. That distinguishes this case from *Thunder Basin*, where the Supreme Court found that compliance would cause no serious harm and that penalties for noncompliance would become final only after full review. 510 U.S. at 216-18. A Plaintiff who travels to Washington at personal expense cannot recover the expense. A Plaintiff who signs a certification cannot withdraw it from the Board's file. A Plaintiff who discloses the names and ages of minor children cannot undo the disclosure. And once Plaintiffs comply, no noncooperation proceeding will occur and no Commission or appellate review will ever be available. A Plaintiff who declines faces expedited noncooperation proceedings, the reporting and reputational consequences of their institution, and a potential bar. *See infra* ¶¶ 40-41, 85. These are "here-and-now" injuries that review at the end of a Board proceeding cannot remedy. *See Axon*, 598 U.S. at 191.

24. Plaintiffs' claims also are not "of the type" Congress intended to channel. Disputes over the lawful scope of compulsory investigative process traditionally are decided by courts, not by the investigating body. When a recipient challenges a Commission investigative subpoena, a district court decides whether the demand is lawful and reasonable before any penalty may be imposed. 15 U.S.C. § 78u(c); *see United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950); *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208-09 (1946). Nothing in the Act suggests that Congress intended to withdraw that traditional judicial role for Board demands while leaving it in place for the Commission's own investigative subpoena. That traditional judicial role matters all the more where, as here, the demands are issued not by accountable government officers but by Board staff whom Congress has declared are not officers or employees of the United States. 15 U.S.C. § 7211(b). Plaintiffs' claims do not concern whether any audit complied with professional standards, and they seek only a declaration of the Board's authority at this particular time. They turn on general principles of federal law, including the distinction between testimony and the compelled creation of new documents, the meaning of a refusal to testify, the payment of compelled witnesses, and the limits of a compulsory process directed abroad, on which neither the Board nor the Commission possesses distinctive expertise and on which this Court owes no deference. *Loper Bright*, 603 U.S. at 412-13. *Thunder Basin* is not to the contrary: there, the operator's claims required interpretation of the mine-safety statute's walk-around provisions, a subject "squarely within" the expertise of an independent review commission created to develop a uniform interpretation of that statute. 510 U.S. at 214-15.

25. Plaintiffs' injury is present and complete. Each Plaintiff must either spend no less than an estimated $18,000 to $22,000 of their personal or Firm funds, and lose time from work, to travel to Washington by dates varying between December 2 and 17, 2026 for their appearance, or

decline to travel for their testimony and face noncooperation charges. Each Plaintiff likewise must, by November 4, 2026, either create and sign certifications that no individual reasonably can make without qualification, exposing that Plaintiff to a "false material declaration" charge, or decline and face noncooperation charges. By the same date, each Plaintiff must also complete and sign a 17-item background questionnaire, demanding *inter alia* the names and ages of each Plaintiff's minor children, under a declaration invoking the Board's noncooperation rule, or decline and face the same charges. Either way, the harm occurs now and does not depend on how any future proceeding might resolve.

26. This controversy will not end with any accommodation the Board might offer once sued. The questions presented arise in every Board investigation in which DEI compels testimony or demands certifications. The Board's investigative rules make no provision for any compelled witness' expenses, upon information and belief the Board never has paid the travel expenses of a witness compelled to testify in an investigation, and its staff stated the Board's expectation in categorical terms: "we request that the witnesses show up." Plaintiffs remain subject to the Board's investigation and to further demands. A defendant's voluntary cessation of challenged conduct does not moot a case unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The Board cannot carry that burden.

27. This Court has personal jurisdiction over the Board, which is organized under the District of Columbia Nonprofit Corporation Act and maintains its headquarters in this District. 15 U.S.C. § 7211(a)-(b).

28. Venue lies in this District under 28 U.S.C. § 1391(b)(1) because the Board resides here, and under § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims

occurred here: the Board issued its order of formal investigation here, Board staff issued the accounting board demands and refused Plaintiffs' requests from the Board's Washington office, as the Associate Director confirmed ("you're here, I'm here and the documents are here"), and the demands command Plaintiffs to appear here. To the extent the Board is an agency or instrumentality of the United States, as the Board and the United States repeatedly have maintained, venue also lies under 28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

29. The facts establish four points that track the statutory question at the heart of this case. Congress gave the Board two compulsory investigative powers, testimony and documents, conditioned them on fair procedures, and confined noncooperation sanctions to refusals (Parts A and B). Federal law, including the Board's own hearing rules, uniformly requires the party that compels attendance to pay for it, and no federal body compels a witness to create documents (Parts C and D). The Board nevertheless has demanded that Plaintiffs fund their own compelled appearances and manufacture certifications and questionnaire responses, and when challenged its staff defended the travel demand with nothing more than staff convenience and an internet forum (Parts E, F, and G). And the Board enforces those demands through the threat of career-ending sanctions with no avenue for review before they attach (Part H).

### A. Congress Gave the Board Two Compulsory Investigative Powers: Testimony and Documents.

30. Sarbanes-Oxley authorizes the Board to investigate any act or practice of a registered public accounting firm or associated person that may violate the Act, the Board's rules, specified provisions of the securities laws, or professional standards. 15 U.S.C. § 7215(b)(1).

31. Congress then specified the compulsory tools available in such an investigation. The Board may "require the testimony of the firm or of any person associated with a registered

public accounting firm," and may "require the production of audit work papers and any other document or information in the possession of a registered public accounting firm or any associated person thereof, wherever domiciled, that the Board considers relevant or material to the investigation…." 15 U.S.C. § 7215(b)(2)(A)-(B). Those are the Board's compulsory investigative powers. The statute enumerates no others.

32. Congress gave the Board no subpoena power of its own. For persons other than registered firms and their associated persons, Congress authorized the Board only to request testimony and documents and to seek issuance of a subpoena by the Commission. 15 U.S.C. § 7215(b)(2)(C)-(D); Board Rules 5105, 5111. As the Board explained when it proposed its investigative rules, "the Board can only request, and not require, testimony or production of documents from persons other than registered public accounting firms and associated persons of such firms," and must seek "a Commission subpoena to require testimony or document production from any person." PCAOB; Notice of Filing of Proposed Rules Relating to Investigations and Adjudications, Exchange Act Release No. 34-49454, 69 Fed. Reg. 15,394, 15,398 (Mar. 25, 2004) (notice of filing of proposed PCAOB rules, discussing Rule 5105). When Congress wanted compulsion to reach beyond the Board's enumerated powers, it routed that compulsion through the Commission, whose subpoenas carry the witness-fee protections and judicial enforcement described below.

33. Congress also fixed the consequence of noncompliance. If a firm or associated person "refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation," then the Board may suspend or bar the person from association with any registered firm, suspend or revoke the firm's registration, or impose lesser sanctions. 15 U.S.C. § 7215(b)(3).

34. Congress conditioned those powers. Section 105(a) directs the Board to "establish, by rule, subject to the requirements of this section, fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms." 15 U.S.C. § 7215(a).

35. Congress likewise specified the consents it required of regulated persons. Every application for registration must include the firm's consent "to cooperation in and compliance with any request for testimony or the production of documents made by the Board," together with an agreement to secure similar consents from the firm's associated persons. 15 U.S.C. § 7212(b)(3). Those consents mirror the two compulsory powers in Section 105(b)(2). They say nothing about funding compelled travel or creating certifications.

36. When Congress wanted the Board to obtain money from regulated persons, it said so expressly and limited the means: registration and annual fees, 15 U.S.C. § 7212(f); accounting support fees assessed on issuers and others under 15 U.S.C. § 7219; and civil money penalties imposed only after notice, an opportunity for a hearing, and specified findings, 15 U.S.C. § 7215(c). Congress authorized no other exaction.

37. A violation of a Board rule is treated as a violation of the Exchange Act. 15 U.S.C. § 7202(b)(1). The Board's investigative rules therefore carry the force of federal law, and the Board enforces them under color of federal law.

**B. The Board's Rules Implement Those Powers and Impose Expedited, Career-Ending Sanctions for "Noncooperation."**

38. The Board implements Section 105 through Board Rules 5100 through 5113. An "accounting board demand" ("ABD") is "a command to produce documents and/or to appear at a certain time and place to give testimony." Board Rule 1001(a)(ix). An "accounting board request," by contrast, is "a request to produce documents and/or to appear at a certain time and place to give

testimony." Board Rule 1001(a)(x).[3] The distinction is between compulsion and voluntary cooperation: an accounting board demand commands, while an accounting board request asks. Staff designated in an order of formal investigation may issue ABDs without further Board approval. Board Rules 5101(a)(2), 5102(b). Those staff members are not officers or employees of the United States. 15 U.S.C. § 7211(b).

39. An ABD for testimony must give "reasonable notice of the time and place" and state the recording method, "which may be by sound or sound-and-visual, but shall include by stenographic means." Board Rule 5102(b)(1)-(2). No Board rule requires that investigative testimony be taken in person, at Board offices, or in the United States. Testimony is taken under protections the Board's rules specify: every witness must declare, "by oath or affirmation," that the witness will testify truthfully, Board Rule 5102(c)(1); examinations are "conducted before a reporter designated by the Board's staff," Board Rule 5102(c)(2); the witness "may be accompanied, represented and advised by counsel," Board Rule 5109(b); the witness may, upon request, be shown the order of formal investigation, Board Rule 5109(a), and "inspect the official transcript of the witness's own testimony," Board Rule 5109(c); and the witness may submit a written statement of the witness' interests and position, Board Rule 5109(d).

40. Board Rule 5110 authorizes disciplinary proceedings against any person who "may have failed to comply with an accounting board demand" or "may otherwise have failed to

---

[3]Board Rule 1001(a)(ix) provides: "The term 'accounting board demand' means a command to produce documents and/or to appear at a certain time and place to give testimony." Board Rule 1001(a)(x) provides: "The term 'accounting board request' means a request to produce documents and/or to appear at a certain time and place to give testimony." Both definitions became effective pursuant to the Commission's order approving the Board's rules on investigations and adjudications. Exchange Act Release No. 34-49704, File No. PCAOB-2003-07, 69 Fed. Reg. 29,150 (May 20, 2004). Compliance with an accounting board request is voluntary; the Board's noncooperation rule reaches failure to comply with an accounting board demand, not an accounting board request. Board Rule 5110(a)(1). *See also* Exchange Act Release No. 34-49454, 69 Fed. Reg. 15,394, 15,398 (Mar. 25, 2004) (Board "can only request, and not require, testimony or production of documents from persons other than registered public accounting firms and associated persons of such firms").

cooperate." Proceedings brought solely for noncooperation run on "special and expedited procedures": the respondent must answer within five days, Board Rule 5421(b); DEI need produce only the documents on which it intends to rely, Board Rule 5422(a)(2); and the hearing officer may decide without post-hearing briefing, Board Rule 5445(b). Available sanctions include revocation, suspension, bar, civil money penalties, and censure. Board Rule 5300(b).

41. A suspended or barred person may not remain associated with any registered firm, and no registered firm may permit such a person to remain associated with it. Board Rule 5301(a)-(b). A noncooperation sanction therefore would end each Plaintiff's association with the Firm and bar each Plaintiff from participating in any audit of a U.S. issuer.

### C. Federal Law Uniformly Requires the Party Compelling Attendance to Pay the Witness – or to Go to the Witness.

42. A witness in attendance at any federal court, before a magistrate judge, or at a court-authorized deposition "shall be paid the fees and allowances provided by" 28 U.S.C. § 1821. 28 U.S.C. § 1821(a)(1). Those allowances include a daily attendance fee, § 1821(b); the actual expenses of common-carrier travel by the shortest practical route at the most economical rate reasonably available, § 1821(c)(1); and a subsistence allowance at federal per diem rates when an overnight stay is required, § 1821(d). The statute expressly reaches travel "within and outside the judicial district." § 1821(c)(4).

43. Congress extended the same entitlement to witnesses subpoenaed to agency hearings. 5 U.S.C. § 503(b).

44. The Commission has applied the rule since its earliest years. In January 1937, the Commission amended its Rules of Practice to provide that "[w]itnesses summoned before the Commission shall be paid the same fees and mileage that are paid to witnesses in the courts of the United States." SEC Release Nos. 33-1228, 34-1026 (Jan. 19, 1937). The Commission's current

Rules of Practice carry the rule forward: "Witnesses summoned before the Commission shall be paid the same fees and mileage that are paid to witnesses in the courts of the United States," and "[w]itness fees and mileage shall be paid by the party at whose instance the witnesses appear." 17 C.F.R. § 201.232(f); *see also id.* § 201.232(d) (tender of fees required). The Commission honors that rule in practice: witnesses it subpoenas claim their fees and expenses on the Commission's Form SEC 1712, "Claim for Fees and Expenses of Witness."

45. Agency after agency applies the same principle, including where the agency itself compels attendance. *See, e.g.*, 19 C.F.R. § 201.5 (U.S. International Trade Commission); 12 C.F.R. § 1081.116 (Consumer Financial Protection Bureau, including witnesses subpoenaed on behalf of its Office of Enforcement); 14 C.F.R. § 16.221 (Federal Aviation Administration); 49 C.F.R. § 190.7(g) (Pipeline and Hazardous Materials Safety Administration). Plaintiffs are aware of no federal statute or rule that permits a federal body to compel a witness to travel internationally at the witness's own expense.

46. Even the Commission's own compulsory process stops at the Nation's borders. The Exchange Act authorizes the Commission to require the attendance of witnesses "from any place in the United States or any State at any designated place of hearing." 15 U.S.C. § 78u(b). Congress did not authorize the Commission, the Board's overseer, to compel a witness to travel to the United States from abroad. It is implausible that Congress silently gave the Board, a body subordinate to the Commission, a power over foreign witnesses that it withheld from the Commission itself.

47. Federal courts' own compulsory process is far narrower than the power the Board claims. A federal subpoena may command a person to attend a trial, hearing, or deposition only within 100 miles of where that person resides, is employed, or regularly transacts business in person. Fed. R. Civ. P. 45(c)(1)(A). A federal court may order a national or resident of the United

States who is in a foreign country to appear only upon specified findings, and even then "[t]he person serving the subpoena shall tender to the person to whom the subpoena is addressed his estimated necessary travel and attendance expenses, the amount of which shall be determined by the court and stated in the order directing the issuance of the subpoena." 28 U.S.C. § 1783(a)-(b). Neither Rule 45 nor § 1783 authorizes a federal court to subpoena a foreign national residing abroad: § 1783 reaches only "a national or resident of the United States who is in a foreign country," and Rule 45 incorporates that limit for service abroad. 28 U.S.C. § 1783(a); Fed. R. Civ. P. 45(b)(3). Testimony from a foreign national abroad ordinarily must be sought through letters rogatory or international agreement. *See* 28 U.S.C. § 1781. And depositions of nonparty witnesses presumptively take place where the witness resides or works, and courts routinely permit them by remote means. Fed. R. Civ. P. 30(b)(4).

**D. Neither the Board's Own Hearing Rules, Nor the Commission, Nor Any Federal Court Imposes What the Board Demands Here.**

48. The Board's own rules embrace the same principle for Board hearings: "[a] witness, other than a party, who is summoned to a Board proceeding pursuant to an accounting board demand, or an accounting board request, or who is deposed pursuant to Rule 5425, shall be paid his or her reasonable expenses by the party at whose instance the witness appears." PCAOB Rule 5424(a)(4); *see also* Securities Exchange Act Release No. 34-49704, 69 Fed. Reg. 29,150 (May 20, 2004) (approving the PCAOB's rules relating to investigations and adjudications).

49. Board Rules 5100 through 5113, which govern investigations, contain no provision authorizing the payment of witness fees, mileage, travel, subsistence, or other reimbursement to witnesses compelled to testify, nor do those rules authorize shifting to compelled witnesses the costs of preparing materials for the Board's investigative purposes. The omission is conspicuous. In drafting its investigative and adjudicative rules, the Board borrowed extensively from analogous

Commission procedures. The Board explained, for example, that Rule 5109(b), governing a witness' right to counsel, was "adapted from Rule 7(b) of the Commission's Rules Relating to Investigations," and that Rule 5425, governing depositions, was "adapted from Rule 233 of the Commission's Rules of Practice." Securities Exchange Act Release No. 34-49454, 69 Fed. Reg. 15,394 (Mar. 25, 2004) (notice of filing of proposed rules relating to investigations and adjudications); *see also* Securities Exchange Act Release No. 34-49704, 69 Fed. Reg. 29,150 (May 20, 2004) (approving those rules). Yet the Board did not incorporate the Commission's longstanding provisions governing witness reimbursement. The Board only carried the witness-fee principle into its hearing rules. *See* PCAOB Rule 5424(a)(4). It did not do so in its investigative rules. Nor does any provision of the Act or the Board's rules authorize shifting to a compelled investigative witness the costs of preparing analyses, compilations, summaries, or other materials for the Board's investigative purposes.

50. The Board's rules likewise recognize that a witness' location outside the United States may render live testimony impracticable. Rule 5426(b) permits the use of a witness' prior sworn statement at a Board hearing when "the witness is out of the United States." PCAOB Rule 5426(b). The Board thus expressly accommodates the burdens imposed by international travel in adjudicative proceedings.

51. When Congress addressed foreign firms specifically, it required them to produce audit work papers and other documents on request, to designate an agent in the United States for service of Board requests, and to submit to the jurisdiction of United States courts for enforcement of document requests. 15 U.S.C. § 7216(b), (d). Congress also permitted the Board to share information with, and rely on the investigations of, foreign oversight authorities. 15 U.S.C. §

7215(b)(5)(C); Board Rule 5113. Congress did not require foreign firms or their personnel to travel to the United States to testify, still less at their own expense.

52. Nor does federal law compel a witness to create documents. The Commission's investigative subpoenas command the production of existing documents, and a recipient who does not comply faces only the prospect that "the Commission may seek a court order requiring [the recipient] to do so." SEC Form 1662, *Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena*, Part F (rev. 09-21). Commission staff may request business record certifications and confirmation that a production is complete, *see* SEC Div. of Enf't, *Enforcement Manual* §§ 3.2.9.5 (Business Record Certifications), 3.2.9.6 (Confirming Completeness of Production) (Feb. 24, 2026), and may ask a witness about completeness in sworn investigative testimony. But the Commission cannot compel a witness or entity to create a certification. A request is not a command, and the Commission's only means of compulsion, a subpoena, reaches existing documents and testimony and is enforceable only by court order. The same is true of background questionnaires: Commission staff, in some investigations, ask witnesses to complete them, but make clear that completing them is optional. *Cf.* SEC Form 1662, Part E ("Disclosure of the requested information to the Commission is voluntary on your part."). That distinction is critical. A voluntary request for a certification or questionnaire does not imply statutory authority to compel one. The Commission's practice of asking, rather than commanding, reflects the limits of compulsory investigative process, and the Board, which possesses no compulsory power greater than its overseer's, cannot convert the Commission's request into a command backed by the threat of career-ending sanctions. A federal subpoena likewise reaches only documents and information within the recipient's "possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii); see Fed.

R. Civ. P. 34(a)(1). This Court has held that these rules require production of existing materials, not the creation of new ones. "Rule 34 only requires a party to produce documents that are already in existence." *Alexander v. FBI*, 194 F.R.D. 305, 310 (D.D.C. 2000). A responding party therefore cannot be compelled to create a new document, certification, questionnaire, narrative response, or other written statement solely for production. *See id.* Where the Federal Rules require a signature on discovery responses, they require it of counsel or an unrepresented party, limit it to the signer's "knowledge, information, and belief formed after a reasonable inquiry," and subject it to the supervision of a court. Fed. R. Civ. P. 26(g)(1).

**E. The Board Issues ABDs to Does 1, 2, and 3.**

53. DEI, for the Board, is conducting its investigation pursuant to an Order of Formal Investigation.

54. On October 15, 2026, DEI staff served an ABD on each Plaintiff, through counsel, commanding that each Plaintiff appear for sworn testimony at the Board's offices at 1666 K Street, N.W., Washington, D.C. 20006, on December 2 and 3, 2026 for Doe 3; on December 9 and 10, 2026 for Doe 2; and on December 16 and 17, 2026 for Doe 1 (together, the "ABDs"). The ABDs also require Plaintiffs to provide written certifications and to complete a background questionnaire, as set forth in Part G, below.

**F. The Board Demands That Plaintiffs Fund Their Own Compelled Appearances.**

55. The ABDs tendered no fees or expenses, offered no reimbursement, and did not address the cost of Plaintiffs' travel from Country X to Washington, D.C.

56. Plaintiffs live more than 9,000 miles from Washington, D.C. Attending would require approximately 25 to 30 hours of travel each way and, for Does 1 and 3, a U.S. visa. The out-of-pocket cost to each Plaintiff would be substantial: round-trip airfare alone of $10,000 to

$12,000; and seven to ten days' hotel lodging, needed to allow recovery from jet lag before testifying, together with related food expenses, of another $8,000 to $10,000. Each Plaintiff thus would bear $18,000 to $22,000 in direct expenses, plus the loss of the time away from work that the trip demands. For the three Plaintiffs together, the direct cost would be $54,000 to $66,000 before counting lost time from work, a disproportionate burden for a firm of the Firm's size.

57. On October 15, 2026, Plaintiffs' investigation defense counsel raised these burdens with the Associate Director in DEI responsible for the investigation (the "Associate Director") in a series of emails exchanged over 40 minutes. The exchange is attached as Exhibit A [redacted to omit the caption of the matter and the Associate Director's name].

58. At 3:14 p.m., Plaintiffs' counsel wrote: "The clients are in Asia. Are you amenable to videoconference testimony?" Eleven minutes later, the Associate Director refused:

> "No, we request that the witnesses show up—you're here, I'm here and the documents are here."

59. The Associate Director identified no investigative need for in-person testimony, only the location of Board staff, of Plaintiffs' counsel, and of documents. None justifies the Board's demand. Plaintiffs' counsel does not testify and can travel to his clients. The Associate Director's stated justification that "the documents are here" was, at best, disingenuous. The documents are the Firm's own audit workpapers and records, and the originals are in Country X, not "here" in Washington, D.C. So is every original source electronic device on which the communications the ABDs demanded were created and kept: the computers, servers, mobile telephones, and other devices of the Firm and its personnel, all of which are located in Country X. The only documents in Washington are copies the Firm already produced to the Board, which Board staff can display to a witness by videoconference as readily as across a conference table.

And the convenience of Board staff is precisely the interest that federal law requires the summoning party, not the witnesses, to pay for.

60. At 3:27 p.m., Plaintiffs' counsel asked whether Board staff would take the testimony where Plaintiffs live:

> "I have inquired if they have visas to the US. Would you consider going there? That is a disproportionate major expense to a small firm to fly three people to the U.S."

Plaintiffs' counsel added that his inquiry confirmed he already had forwarded the ABDs to Plaintiffs. Two minutes later, the Associate Director replied: "No, I'm not going there."

61. At 3:30 p.m., Plaintiffs' counsel asked the obvious question: "And, if they don't have US visas?"

62. At 3:54 p.m., the Associate Director responded. The entire response consisted of the following text, set off in quotation marks and without attribution:

> "Approval Rate: Historically high (around 96.7% for B1/B2 visas). Most users on Reddit note that applicants generally have a smooth process if they show steady local employment, travel history, and strong financial ties to [Country X]."

63. That was the Board's only answer to whether witnesses who lack U.S. visas can comply with its demands. The Associate Director cited no statute, Board rule, Board policy, or precedent. The Associate Director did not offer to accommodate a witness whose visa is delayed or refused, or to pay visa fees. The Associate Director offered the impressions of anonymous users of an internet discussion forum, unsourced and unverified, as though they settled whether a federal regulator may disregard the protections federal law affords every compelled witness.

64. Reddit is not law, and an unsourced Reddit post would not even be admissible in this Court. *See* Fed. R. Evid. 802, 901. Neither Country X nor Country Y participates in the Visa Waiver Program, 8 U.S.C. § 1187, so Does 1 and 3 each must apply for a B-1/B-2 visitor visa, pay

a $185 application fee, attend a consular interview, pay a $250 visa integrity fee, and overcome the statutory presumption that every visa applicant is an intending immigrant. 8 U.S.C. § 1184(b). Whether to issue a visa rests with a consular officer of the Department of State, whose decision, as a rule, is not subject to judicial review. See *Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024) (explaining that Congress has not authorized judicial review of a consular officer's denial of a visa and that, as a rule, federal courts cannot review such decisions). Neither the Board nor its staff can assure that any Plaintiff will receive a visa, or receive one in time. Visa issuance depends on the independent judgment of a consular officer and therefore remains beyond the Board's control.

65. Even on the Associate Director's own figure of a 96.7% approval rate, roughly one applicant in thirty is refused, and the decision rests entirely outside Plaintiffs' control. And Doe 3 must apply in Country X, outside Doe 3's country of citizenship, as a third-country national. Under the Board's position, a Plaintiff whom the Department of State declines to admit would face enforcement action for "noncooperation" with a demand that Plaintiff had no lawful means to satisfy.

66. The Associate Director did not purport to exercise judgment specific to this investigation. The Associate Director stated the Board's expectation of all witnesses: "we request that the witnesses show up." The Board's investigative rules make no provision for the expenses of any compelled witness, anywhere. Upon information and belief, the Board never has tendered or paid travel or subsistence expenses to any witness compelled by accounting board demand to testify in an investigation, regardless of country of domicile or distance.

67. The Board's practice is not confined to witnesses abroad. DEI routinely compels associated persons throughout the United States to travel, at their own expense, to Washington or to another Board office of staff's choosing to testify, often across distances far greater than the

100-mile limit that governs a federal subpoena. The demand on Plaintiffs, who must cross the globe and obtain visas to comply, is the same practice in its most extreme form.

68. Board staff have taken sworn investigative testimony by videoconference in other investigations, including during and after the COVID-19 pandemic and including for witnesses located outside of the United States, including in Canada. Board staff also travel abroad to inspect registered foreign firms. The Board has ample financial resources to conduct investigative examinations remotely when appropriate. For fiscal year 2026, the PCAOB operates under a budget of approximately $362.1 million. *See* Public Company Accounting Oversight Board, *2026 Budget* at 12 (2025) (reflecting total 2026 outlays of $362.127 million); Press Release No. 2026-11, SEC, SEC Approves 2026 PCAOB Budget and Accounting Support Fee (Jan. 22, 2026).

**G. The ABDs Demand That Plaintiffs Create and Sign Written Certifications and Background Questionnaires.**

69. The ABDs served on October 15, 2026 also command the Plaintiffs, in relevant part (identifying information omitted), to:

> 1. Provide a written certification that to the extent they were under your control, all documents responsive to the Division's single Accounting Board Request and two Accounting Board Demands, other than those withheld based on a privilege asserted in accordance with PCAOB Rule 5106, have been produced.
>
> 2. For the identified period, all documents, including but not limited to communications, emails and attachments thereto, instant messages, Microsoft Teams messages, text messages, WhatsApp or any other third-party messaging application messages, memoranda, notes, internal and external correspondence, electronically stored information, and hard copy documents, concerning:
>
>     a. The Firm's audit of the consolidated financial statements of Issuer A for the identified fiscal year;
>
>     b. The Firm's audit of the consolidated financial statements of Issuer B for the identified fiscal year;

c. The Firm's audit of the consolidated financial statements of Issuer C for the identified fiscal year;

d. Any changes to, additions to, or deletions from the audit documentation for any of the above-referenced audits; and

e. The PCAOB's inspection of Audit Firm including, but not limited to, internal communications among Audit Firm's personnel before, during, and after the inspection; and communications with staff of the PCAOB Division of Registration and Inspections.

3. Provide a written certification that all documents responsive to this ABD, other than those withheld based on a privilege asserted in accordance with PCAOB Rule 5106, have been produced.

70. Paragraphs 1 and 3 of the demands quoted above (the "Certification Demands") do not call for the production of any existing document. They command each recipient to create a new document, a signed written attestation that a production is complete, that does not exist and would never exist but for the Board's command. The certifications are due November 4, 2026.

71. The Certification Demands are unqualified. Paragraph 3 demands certification that "all documents responsive to this ABD" have been produced, without limitation to the certifier's knowledge, information, and belief, and without reference to any reasonable search. Paragraph 2 of the same ABD reaches every email, attachment, instant message, Microsoft Teams message, text message, WhatsApp or other third-party messaging application message, memorandum, note, and hard-copy document concerning three audits, any change to their audit documentation, and a Board inspection of the Firm, including communications "before, during, and after the inspection." The Firm has between 30 and 40 employees, whose messages may reside on personal devices and third-party messaging applications that none of the Plaintiffs control. Plaintiffs have made, and continue to make, diligent efforts to ensure that the Firm's productions are complete. But no individual, however diligent, can give the unqualified guarantee the Board's Certification Demands require as to every message on every device used by every member of a 30-to-40-person

firm. That is why federal practice limits any comparable attestation to the signer's "knowledge, information, and belief formed after a reasonable inquiry." Fed. R. Civ. P. 26(g)(1).

72. Paragraph 1 of the ABDs reach back further still. It demands certification of the completeness of productions made in response to the Division's earlier Accounting Board Request and two earlier ABDs, each of which was directed to the Firm, not to any Plaintiff. The Certification Demands thus require each Plaintiff to vouch personally for productions the Firm made in response to requests and demands that were never addressed to that Plaintiff. The Board's rules draw a sharp line between the two instruments. An accounting board demand is "a command to produce documents and/or to appear at a certain time and place to give testimony." Board Rule 1001(a)(ix). An accounting board request, by contrast, is "a request to produce documents and/or to appear at a certain time and place to give testimony." Board Rule 1001(a)(x); *see supra* ¶ 38 & n.3. An accounting board request is thus voluntary. And the Board's noncooperation rule makes failure "to comply with an accounting board demand," not an accounting board request, a ground for disciplinary proceedings. Board Rule 5110(a)(1). By demanding, under threat of sanction, a certification that a voluntary production was complete, the Board converts a voluntary request into a compulsory one after the fact.

73. A compelled certification is testimony in substance. "Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the [subpoena recipient]. It also would indicate the [subpoena recipient's] belief that the papers are those described in the subpoena." *Fisher v. United States*, 425 U.S. 391, 410 (1976). The act of production "may certainly communicate information about the existence, custody, and authenticity of the documents," and assembling documents responsive to broad categories is "tantamount to answering a series of interrogatories." *United States v. Hubbell*, 530 U.S. 27, 36-37, 41 (2000);

*see id.* at 43 (likening the assembly of responsive documents to "telling an inquisitor the combination to a wall safe"). The Board's Certification Demands convert that implicit communication into an explicit written attestation that Board staff may later characterize as a "false material declaration," while dispensing with the oath or affirmation, reporter, counsel, and transcript-inspection protections that attend testimony under the Board's rules. Board Rules 5102(c), 5109. No Board rule authorizes staff to compel a written attestation outside those procedures. *See* Board Rules 5100-5113.

74. The ABDs also command each Plaintiff to complete, sign, and return, by November 4, 2026, the Board's "PCAOB Witness Background Questionnaire" (the "Questionnaire," and the demand to complete it, the "Questionnaire Demand"). The Questionnaire is a 17-item form that, upon information and belief, DEI uses across investigations without tailoring it to the subject of any particular investigation.

75. The Questionnaire demands far more than any document in Plaintiffs' possession. It requires each Plaintiff to state the Plaintiff's date and place of birth and every residence during the preceding five years; to disclose the Plaintiff's marital history, including each Plaintiff's spouse's name, any maiden name, and the dates of each marriage, and the current spouse's age and occupation; and to "[l]ist the names, ages, and occupations of all of your close family members," a term defined to include every "parent, dependent, nondependent child, and sibling." Questionnaire Items 3, 4, 6, 7. The Questionnaire thus, on its face, commands each Plaintiff to identify, by name and age, even each Plaintiff's minor children. It further demands a lifetime history of every occasion on which the Plaintiff testified, was interviewed, or provided documents in any proceeding relating to the Plaintiff's business or employment; any employer discipline; any civil, administrative, or criminal proceeding; every school attended since secondary school; a

complete employment history; every issuer, broker, or dealer for which the Plaintiff performed more than ten hours of services in five years; every professional membership; and every publication, including "internal firm directives, manuals, alerts, guidance or literature." Questionnaire Items 9-17.

76. Much of the Questionnaire seeks professional information, such as licenses, accounting and auditing experience, and client engagements, that may bear on an investigation of audit work. Plaintiffs do not contend otherwise, and they are prepared to answer relevant questions in testimony. But the Questionnaire sweeps far beyond any legitimate investigative need. Read as written, it requires each Plaintiff to identify the high school the Plaintiff attended; every job the Plaintiff has held since college, however unrelated to accounting or auditing, so that a job at an ice cream store must be listed alongside an audit partnership; every home address during the past five years, down to one occupied four years and eleven months ago; and the names and ages of the Plaintiff's minor children. None of that information has any conceivable bearing on whether the Firm's audits complied with professional standards or whether its audit documentation is complete. The Questionnaire borrows its definition of "close family members" from the Commission's auditor-independence rule, Rule 2-01(f)(9) of Regulation S-X, but upon information and belief the Board's investigation does not concern auditor independence. To that extent, the Questionnaire Demand reaches the private lives of each Plaintiff's family members who are not associated with any registered firm, and from whom Congress gave the Board no power to compel anything. *See* 15 U.S.C. § 7215(b)(2)(C)-(D).

77. As with the Board's Certification Demands, the Questionnaire Demand does not call for the production of any existing document. It commands each Plaintiff to compose a new one. And it requires each Plaintiff to sign a declaration: "I declare that my answers to the questions

above are complete and accurate to the best of my knowledge. I also understand that PCAOB Rule 5110 applies to the information I have provided in response to this questionnaire." The Questionnaire then sets out Rule 5110(a), including its provision for disciplinary proceedings against any person who "may have knowingly made any false declaration." A misremembered address from five years ago, an omitted ten-hour engagement, or an overlooked internal firm alert thus becomes a potential predicate for a noncooperation charge.

78. The Commission's practice confirms the problem. As noted above, Commission staff, in some investigations, also ask witnesses to complete background questionnaires, but make clear that completing them is optional. *See supra* ¶ 52. A witness who declines faces no sanction, and the staff may inquire about subjects included in the Commission's background questionnaire in investigative testimony. The Board, by contrast, has embedded its Questionnaire in a compulsory demand and has tied it, by its own terms, to the Board's noncooperation rule.

79. The Board has a lawful means to obtain whatever background information it legitimately needs: it may ask the witness in testimony, on the record, under oath or affirmation, with counsel present, under the procedures its rules prescribe. Board Rules 5102(c), 5109. The Questionnaire Demand dispenses with those procedures and compels a signed written statement instead.

## H. The Board Enforces Its Demands Through the Threat of Career-Ending Sanctions, With No Avenue for Review.

80. Each ABD was accompanied by the Board's Form ENF-1, which warns:

> Noncooperation with the Board in connection with an investigation may result in the imposition of sanctions as described below. Conduct constituting noncooperation includes (1) failing to comply with an Accounting Board Demand, (2) knowingly making any false material declaration or making or using any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material

> declaration, (3) abusing the Board's processes for the purpose of obstructing an investigation, or (4) otherwise failing to cooperate in connection with an investigation (See PCAOB Rule 5110(a)).

Form ENF-1 continues:

> Under Section 105(b)(3) of the Act, 15 U.S.C. § 7215(b)(3), if a registered public accounting firm refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation, the Board may suspend or revoke the registration of the firm, or invoke such lesser sanctions as the Board considers appropriate. Similarly, if a person associated with a registered public accounting firm refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation, the Board may suspend or bar such person from being associated with a registered public accounting firm, or may require the registered public accounting firm to end such association, or may invoke such lesser sanctions as the Board deems appropriate. PCAOB Rules 5110 and 5300(b) implement this authority.

81. Form ENF-1 thus treats any failure "to comply with an Accounting Board Demand" as sanctionable noncooperation, and its catch-all nature reaches anyone who "otherwise fail[s] to cooperate." Yet the statute Form ENF-1 invoked authorizes sanctions only against a person who "refuses to testify, produce documents, or otherwise cooperate." 15 U.S.C. § 7215(b)(3). The Board's form silently expands the statutory standard from refusal to any departure from staff's terms. Form ENF-1 says nothing about who pays for compelled travel, about remote testimony, about witnesses who cannot obtain a visa, or about certifications or questionnaires.

82. Plaintiffs have not refused to testify or to produce documents. Through counsel, Plaintiffs have offered to testify by videoconference or in person in Country X. They object only to the place and cost of testimony and to the demands that they create certifications and complete the Questionnaire.

83. Each path open to any of the Plaintiffs leads to sanction. A Plaintiff who declines to travel at personal expense faces a charge of failing to comply with an ABD. A Plaintiff who

declines to sign the certifications faces the same charge. A Plaintiff who signs an unqualified certification of a firm-wide collection, faces, if a single responsive message on any employee's device were later to surface, a charge that the certification was a "false material declaration." The demands thus manufacture a predicate for sanction whichever way a Plaintiff turns.

84. No Board rule permits a witness to petition the Board, a hearing officer, or the Commission to quash or modify an ABD, or to direct payment of witness expenses, before the compliance date. DEI staff's decisions about the place and cost of compelled testimony, and its demands for certifications, are unreviewable unless and until the witness refuses, is charged, and is sanctioned.

85. Even a noncooperation charge later set aside would inflict immediate and irreparable harm. The institution of civil enforcement proceedings would trigger reporting by the Firm on Board Form 3, expose Plaintiffs to inquiry by regulators in Country X, and jeopardize their standing with the Firm and its clients.

86. The Board's practice therefore extracts private funds and compelled attestations from Plaintiffs under threat of professional ruin, without statutory authorization, without a governing rule, and without any avenue of review.

87. Plaintiffs thus have no adequate remedy at law. Funds spent to comply cannot be recovered from the Board, no damages remedy exists for the Board's conduct, and a certification once signed cannot be withdrawn from the Board's file.

## <u>CLAIMS FOR RELIEF</u>

88. Plaintiffs' claims proceed in three tiers. Counts I through IV are statutory. They ask a single question, whether Congress authorized what the Board has done, and they arise directly from the text of Section 105. Two of them turn on the plainest statutory text. Count II asks whether

a power to require "testimony" and the production of documents "in the possession of" a witness includes a power to compel the witness to create new certifications and questionnaires. It does not. Count IV asks whether a statute that authorizes sanctions against a person who "refuses" to testify or produce documents reaches a witness who offers both but objects to conditions Congress never authorized. It does not. Count I applies the same principle to compelled self-funded travel, and Count III to the Act's requirement of "fair procedures" established by Commission-approved rule. Those counts do not depend on the constitutional rights of persons abroad or on the Administrative Procedure Act, and each independently entitles Plaintiffs to relief. Counts V and VI arise under the Due Process Clause of the Fifth Amendment and are pleaded in the alternative: even if the Board possessed statutory authority for its demands, the procedures by which it imposes them are fundamentally unfair and give no fair notice of what the law requires. Count VII arises under the Administrative Procedure Act and is pleaded in the further alternative. Consistent with the principle that courts decide statutory questions before constitutional ones, Plaintiffs ask the Court to resolve Counts I through IV first; and the Court need reach Counts V through VII only if it does not grant complete relief on the statutory counts, Counts I through IV.

## I. STATUTORY CLAIMS

Counts I through IV ask whether Congress authorized the Board's demands and the sanctions it threatens. Each arises from the text of Section 105, and each independently entitles Plaintiffs to complete relief.

### Count I – Action in Excess of Statutory Authority
### (No Authority to Compel Self-Funded Travel, 15 U.S.C. § 7215(b)(2))

89. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 87 as if fully set forth herein.

90. The Board possesses only the powers Congress conferred. Section 105(b)(2) authorizes the Board to "require the testimony" of associated persons. 15 U.S.C. § 7215(b)(2)(A). It does not authorize the Board to require associated persons to pay for their own compelled attendance, and no other provision of the Act does.

91. Congress knew how to authorize the Board to collect money from regulated persons and did so expressly, through registration and annual fees, 15 U.S.C. § 7212(f), accounting support fees, *id.* § 7219, and civil money penalties imposed only after notice, a hearing, and specified findings, *id.* § 7215(c). A requirement that a witness spend $18,000 to $22,000 to attend a Board-chosen location is an exaction in all but name. Congress never authorized it, and the Board may not create by staff demand a funding mechanism that Congress withheld.

92. Congress enacted Section 105 against the settled federal practice of providing compelled witnesses with witness fees, mileage, and travel-related allowances. 28 U.S.C. §§ 1783(b), 1821; 5 U.S.C. § 503(b); 17 C.F.R. § 201.232(f). Congress also enacted Section 105 knowing that it had confined even the Commission's subpoena power to witnesses "from any place in the United States." 15 U.S.C. § 78u(b). Congress is presumed to legislate with knowledge of that baseline. Had Congress intended to depart from it, and to give a private nonprofit corporation a compulsory power broader than that of any federal court, it would have said so. It did not.

93. When Congress addressed foreign firms specifically, it required them to produce documents, to designate a U.S. agent for service of Board requests, and to submit to United States courts for enforcement of document requests. 15 U.S.C. § 7216(b), (d). It did not require foreign associated persons to travel to the United States, and Board staff cannot supply by fiat what Congress omitted.

94. The presumption against extraterritoriality reinforces that reading. Federal statutes apply only domestically unless Congress clearly indicates a contrary intent. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010); *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335–37 (2016). The Board may point to Section 106, which extends the Board's registration, inspection, investigative, and disciplinary authority to foreign public accounting firms that prepare or furnish audit reports with respect to U.S. issuers. But Section 106 demonstrates the extent to which Congress expressly addressed the Board's authority abroad. Congress required foreign firms to produce documents upon request, designate a United States agent for service of process, and deemed such firms to have consented to the jurisdiction of United States courts for purposes of enforcing requests for audit work papers. 15 U.S.C. § 7216(b), (d). That limited consent extends only to requests for audit work papers. Nothing in Section 106 subjects foreign associated persons to compelled testimony in the United States, and the Board's accounting board demands for testimony are enforced not by any court but by the Board's own noncooperation proceedings. Nothing in Section 106, or elsewhere in the Sarbanes-Oxley Act, clearly authorizes the Board to compel an individual residing abroad to travel to the United States at personal expense to provide testimony. If Congress had intended to authorize that distinct and substantial extraterritorial burden, one would expect Congress to have said so expressly.

95. Nor may Board staff impose such a requirement by staff demand. No rule of the Board may take effect without prior Commission approval. 15 U.S.C. § 7217(b)(2)-(3). The Board's investigative rules approved by the Commission contain no provision requiring witnesses to fund their own compelled travel, and nothing in the Board's proposing release or the Commission's approval order suggests that the Board sought, or that the Commission approved, such authority. Securities Exchange Act Release No. 34-49454, 69 Fed. Reg. 15,394 (Mar. 25,

2004); Securities Exchange Act Release No. 34-49704, 69 Fed. Reg. 29,150 (May 20, 2004). The Associate Director's assertion that "we request that the witnesses show up" suggests the application of a generally operative policy. Yet no such requirement appears in any Commission-approved Board rule.

96. The Court determines the scope of the Board's statutory authority de novo and owes no deference to the Board's interpretation of the Act. *Loper Bright*, 603 U.S. at 412-13. The Board's position also lacks any considered administrative pedigree. No Board rule addresses witness expenses in investigations, no Commission-approved interpretation endorses the requirement asserted here, and the only identified articulation of the Board's position is the Associate Director's email.

97. Plaintiffs are entitled to a declaration that the Sarbanes-Oxley Act does not authorize the Board to compel an associated person, whether residing within or outside the United States, to travel at that person's own expense to provide testimony in a Board investigation. Plaintiffs are further entitled to a declaration that the Board may not enforce the ABDs' in-person attendance requirements unless the Board either, (1) conducts Plaintiffs' testimony remotely at a reasonable time during ordinary business hours in Country X, (2) conducts Plaintiffs' testimony in Country X, or (3) tenders in advance the witness fees and allowances required by federal law.

**Count II – Action in Excess of Statutory Authority**
**(No Authority to Compel Written Certifications or Questionnaires, 15 U.S.C. § 7215(b)(2))**

98. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 87 as if fully set forth herein.

99. Section 105(b)(2) confers two forms of compulsory investigative process: (1) the power to "require the testimony" of a firm or associated person, and (2) the power to "require the production" of documents and information "in the possession of" the firm or associated person. 15

U.S.C. § 7215(b)(2)(A)-(B). Those grants of authority reach testimony and preexisting documents and information in the witness' possession. Congress conferred no separate authority to compel a witness to create, certify, and sign a new document in response to a Board demand.

100. The Certification Demands fall outside both grants of authority. A certification that does not exist until the witness prepares and signs it is neither testimony nor a document or item of information "in the possession of" the witness. *See* 15 U.S.C. § 7215(b)(2)(A)-(B). Nor is a written attestation compelled outside the Board's testimony procedures "testimony" within the meaning of Section 105(b)(2)(A). Reading "information" to encompass any statement that the Board directs a witness to create would collapse Congress' distinction between testimony and production, render the Board's testimony procedures optional at DEI staff's election, and effectively authorize compulsory written interrogatories that Congress did not provide.

101. The Questionnaire Demand falls outside both grants of authority for the same reasons. A completed Questionnaire does not exist until the witness prepares it, and a signed written declaration compelled outside the Board's testimony procedures is not testimony obtained under those procedures. That portions of the Questionnaire seek information the Board may properly investigate does not alter the analysis. Congress authorized the Board to obtain information through testimony and through the production of documents and information already in a witness' possession; Congress did not authorize the Board to compel the creation of a new written declaration for investigative purposes. The Commission, which oversees the Board, treats its own background questionnaire as voluntary rather than compulsory. Moreover, certain requests, including information concerning Plaintiffs' minor children, previous home addresses and

employment history unrelated to accounting and finance work, cannot reasonably be characterized as "relevant or material to the investigation."[4] 15 U.S.C. § 7215(b)(2)(B).

102. The consents Congress required of registered firms and their personnel confirm the point. They extend to "any request for testimony or the production of documents," 15 U.S.C. § 7212(b)(3), and to nothing else. Congress did not require any registered firm or associated person to consent to create certifications.

103. The Commission, which oversees the Board and whose procedures served as a model for many of the Board's investigative rules, may request completeness certifications and may inquire into the completeness of a document production through sworn testimony. But the Commission's own investigative authority is directed toward obtaining testimony and existing documents and information, and its subpoenas are enforceable only through an order of a federal court. *See* 15 U.S.C. § 78u(c); 17 C.F.R. pt. 203. If the Board wishes to determine whether a production is complete, then it possesses the same lawful tool available to the Commission: questioning the witness under oath pursuant to the Board's testimony procedures. Federal courts likewise generally do not compel nonparties to create new documents, analyses, compilations, or reports for an investigation or proceeding. The Board therefore cannot reasonably claim by implication a power that neither its statutory overseer nor the federal courts possess. Nor do the Board's Commission-approved investigative rules contain any certification requirement. Staff may not supply such a requirement by demand. *See* 15 U.S.C. § 7217(b)(2)-(3).

104. Plaintiffs are entitled to a declaration that Section 105(b)(2) authorizes the Board to require testimony and the production of documents and information in the possession of a registered public accounting firm or associated person, but does not authorize the Board to compel

[4] Because the Questionnaire is drafted so broadly, the high school a witness attended, or the witness' hypothetical job at an ice cream store, would be responsive, yet entirely irrelevant. See supra ¶ 76.

the creation of new written certifications, declarations, questionnaires, or other materials for investigative purposes; a declaration that the Certification Demands and Questionnaire Demand exceed the Board's statutory authority; and an injunction barring enforcement of those demands against Plaintiffs.

**Count III – Violation of Section 105(a)**
**(Denial of Fair Procedures, 15 U.S.C. § 7215(a))**

105. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 87 as if fully set forth herein.

106. Section 105(a) permits the Board to investigate registered public accounting firms and associated persons only through "fair procedures." 15 U.S.C. § 7215(a). That requirement is an independent statutory limitation on the Board's investigative authority. Congress directed that such procedures be established by Board rule and approved by the Commission. *See id.* §§ 7215(a), 7217(b). Section 105(a) therefore constrains not only the content of the Board's rules, but also the manner in which those rules are implemented and enforced in individual investigations. The Board may not substitute ad hoc staff requirements for Commission-approved procedures. That principle carries special force here, because the staff members who imposed these requirements are, by statute, not officers or employees of the Federal Government. 15 U.S.C. § 7211(b). Requirements that bind regulated persons under threat of sanction must come, if at all, from rules the Commission has approved, not from the discretion of private employees.

107. Congress enacted Section 105(a) against a settled federal backdrop under which witnesses compelled to attend governmental proceedings receive witness fees and travel-related allowances. *See* 28 U.S.C. § 1821; 5 U.S.C. § 503(b); 17 C.F.R. § 201.232(f). The Board itself incorporated that principle into its hearing procedures by requiring the party summoning a witness to pay the witness' reasonable expenses. *See* PCAOB Rule 5424(a)(4). Yet, neither the Act nor the

Board's investigative rules authorize requiring a witness to bear the costs of compelled attendance, prepare certifications, complete questionnaires, or satisfy other staff-imposed conditions not established by Commission-approved rule. Imposing such requirements through investigative demands rather than duly adopted procedures is inconsistent with Section 105(a)'s command that investigations be conducted through fair procedures.

108. Even if Section 105(b) could be construed to authorize some or all of the challenged demands, the Board's procedures, as applied to Plaintiffs, are not "fair procedures" within the meaning of Section 105(a). Among other things, those procedures: (a) compel Plaintiffs' in-person attendance for investigative testimony in the United States without tendering or reimbursing travel, subsistence, or related expenses; (b) reject, without explanation, alternatives involving remote testimony or testimony taken locally notwithstanding procedures that accommodate testimony from witnesses located outside the United States; (c) provide no mechanism for obtaining review of the location, cost, or conditions of compelled testimony, or of demanded certifications, before sanctions may attach; (d) afford witnesses greater protection in Board hearings than in investigations, notwithstanding the greater procedural safeguards available in hearings; (e) expose Plaintiffs to potential noncooperation sanctions based on circumstances outside Plaintiffs' control, including the denial or delay of needed travel visas from the U.S. Department of State; (f) require individual witnesses to certify the completeness of firm-wide document collections without any express knowledge or reasonable-inquiry limitation; (g) compel written attestations concerning matters within the scope of investigative testimony while bypassing the procedures governing compelled testimony; (h) transform a voluntary accounting board request into a compulsory demand after the fact; and (i) expose a witness to potential sanction(s) regardless of whether the witness signs the demanded certification or declines to do so. In each respect, DEI staff, not any

Commission-approved rule, supplied the requirement. The Board may not substitute ad hoc staff requirements for Commission-approved procedures.

109. Fair procedures cannot subject a witness to compulsory process materially more burdensome than the process available in federal court. No federal statute or rule authorizes a federal court to subpoena a foreign national residing in Country X to travel to the United States to testify; § 1783 reaches only United States nationals and residents abroad, and even then requires advance tender of the witness' estimated travel and attendance expenses. *See* 28 U.S.C. § 1783(a)-(b); Fed. R. Civ. P. 45(b)(3). Even within the United States, a federal court generally may not compel a nonparty witness to travel more than 100 miles from where the witness resides, is employed, or regularly transacts business in person. Fed. R. Civ. P. 45(c)(1)(A). Yet the Board claims authority to compel a witness residing abroad to appear in the United States at the witness' own expense and under threat of sanction. Nothing in Section 105(a) or the Board's rules suggests that Congress intended Board investigations to employ compulsory process more burdensome than that available to Article III courts.

110. Plaintiffs are entitled to a declaration that, consistent with Section 105(a), the Board may not compel Plaintiffs to appear in person in the United States for investigative testimony at Plaintiffs' own expense. Plaintiffs are further entitled to a declaration that the Board's Certification Demands and the Questionnaire Demand deny the Plaintiffs fair procedures required by Section 105(a), and that the Board may not impose, through staff demands, investigative requirements that no Commission-approved rule establishes. Plaintiffs are also entitled to a declaration that the Board may not enforce the Certification Demands or the Questionnaire Demand, and may not enforce the ABDs' in-person attendance requirements unless the Board (a) permits Plaintiffs' testimony to proceed remotely during reasonable business hours in Country X, (b) takes Plaintiffs'

testimony in Country X, or (c) tenders in advance witness fees, travel expenses, and other attendance allowances substantially equivalent to those required by federal law for compelled witnesses and accounts for the possibility that a Plaintiff's needed travel visa from the U.S. Department of State may be delayed or denied.

**Count IV – Action in Excess of Statutory Authority**
**(Noncooperation Sanctions Beyond 15 U.S.C. § 7215(b)(3))**

111. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 87 as if fully set forth herein.

112. Section 105(b)(3) authorizes sanctions only when a person "refuses to testify, produce documents, or otherwise cooperate with the Board in connection with an investigation." 15 U.S.C. § 7215(b)(3). The statute's operative term is "refuses." Congress did not authorize sanctions whenever a witness disputes the manner, location, cost, or legality of a Board demand.

113. Plaintiffs have not refused to testify. To the contrary, Plaintiffs have offered to testify either by videoconference or in person in Country X. Objecting to the location of testimony or to bearing the costs of compelled attendance is not a refusal to testify. Plaintiffs likewise have not refused to produce documents. Declining to create certifications, declarations, questionnaires, or other materials that do not already exist is not a refusal to produce documents or information in Plaintiffs' possession.

114. The residual phrase "otherwise cooperate" does not expand the statute beyond the specific forms of conduct that Congress identified. A general term following specific terms ordinarily takes its meaning from those terms, and an "otherwise" clause is construed in light of the specific conduct that precedes it. *See Fischer v. United States*, 603 U.S. 480, 487-90 (2024); *Yates v. United States*, 574 U.S. 528, 543-46 (2015) (plurality opinion). Read in context with "refuses to testify" and "produce documents," the phrase "otherwise cooperate" reaches conduct

comparable to the withholding of testimony or documents, such as obstruction or concealment. It does not authorize the Board to impose noncooperation sanctions on a witness who offers testimony, offers production of responsive documents, challenges the legality of a demand, declines to bear the costs of compelled attendance, or refuses to create documents that Congress did not authorize the Board to compel.

115. Any broader reading would transform Section 105(b)(3) from an anti-obstruction provision into a source of independent substantive authority. Under the Board's interpretation, a witness could be deemed "noncooperative" not only for refusing testimony or documents, but also for declining to comply with demands that the Act nowhere authorizes. Congress did not confer sanction authority so that the Board could manufacture powers beyond those granted by Section 105(b)(2).

116. Form ENF-1 and Board Rule 5110, as the Board threatens to apply them here, would transform Congress' standard of refusal into a standard of noncompliance with any condition or demand that DEI staff elects to impose. Section 105(b)(3), however, authorizes sanctions only for conduct that Congress has made sanctionable. The Board may not use a form or rule to expand the category of conduct that Section 105(b)(3) reaches.

117. Plaintiffs are entitled to a declaration that declining to travel to the United States at personal or Firm expense while offering to testify by videoconference or in Country X, being unable to obtain a United States visa, and declining to create or sign a certification or complete the Questionnaire do not constitute a refusal "to testify, produce documents, or otherwise cooperate" within the meaning of 15 U.S.C. § 7215(b)(3). Plaintiffs are further entitled to a declaration that such conduct does not constitute a failure to cooperate or comply within the meaning of Board

Rule 5110. Plaintiffs are entitled to an injunction barring the Board from initiating, threatening, maintaining, or relying upon any noncooperation proceeding premised on such conduct.

118. Plaintiffs do not refuse to provide testimony or responsive documents. Plaintiffs object only to conditions that exceed the Board's statutory authority. Section 105(b)(3) does not permit the Board to treat the assertion of statutory rights as noncooperation.

## II. CONSTITUTIONAL CLAIMS (IN THE ALTERNATIVE)

Counts V and VI apply if, and only to the extent that, the Court concludes that the Board's demands fall within its statutory authority. Even then, the Board's procedures deny due process.

### Count V – Violation of the Due Process Clause of the Fifth Amendment (Fundamentally Unfair Procedures)

119. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 87 as if fully set forth herein.

120. Plaintiffs plead Count V in the alternative. Even if the Board possesses statutory authority to require Plaintiffs' attendance, certifications, and questionnaire responses, the procedures by which the Board imposes and enforces those requirements are fundamentally unfair and therefore violate the Due Process Clause of the Fifth Amendment.

121. The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Board exercises governmental authority and is bound by that command. *Free Enter. Fund*, 561 U.S. at 485-86.

122. Plaintiffs are entitled to invoke the Due Process Clause because the United States, acting through the Board, has brought them within a comprehensive federal regulatory and adjudicatory regime. Congress requires foreign public accounting firms that audit U.S. issuers to register with the Board, provide consents relating to testimony and document production, designate a United States agent, and submit to the jurisdiction of United States courts. *See* 15 U.S.C. §§

7212(a)-(b), 7216(b)-(d). Plaintiffs' ability to participate in audits of U.S. issuers exists solely by virtue of federal law and federal regulatory approval. The Board seeks to compel Plaintiffs' conduct under United States law, and threatens sanctions under United States law, subject to review by the Commission and ultimately by the United States courts of appeals. Any resulting sanctions would be imposed through a process created and administered under United States law in the United States. Having required Plaintiffs to submit to that regime as a condition of participating in audits of U.S. issuers, the federal Government must afford constitutionally adequate process before depriving Plaintiffs of protected property or professional interests. *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201-03 (D.C. Cir. 2001); *cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). Plaintiffs do not claim all rights enjoyed by domestic persons in every context. They claim only the right to constitutionally adequate procedures before a United States regulator exercising governmental authority over them.

123. The threatened deprivations implicate protected property and liberty interests. Money is property, and a governmental command that a person spend personal funds to avoid sanction implicates property interests protected by the Due Process Clause. Plaintiffs also possess a liberty interest in pursuing their chosen profession free from unreasonable governmental interference. *See Greene v. McElroy*, 360 U.S. 474, 492 (1959). Government action that formally excludes a person from, or broadly precludes a person from practicing, that profession infringes that interest. *See Kartseva v. Dep't of State*, 37 F.3d 1524, 1527-29 (D.C. Cir. 1994). A noncooperation finding would have precisely that effect: it may result in a bar under PCAOB Rule 5301, foreclose Plaintiffs from any work on audits of issuers subject to the federal securities laws, and inflict lasting reputational injury. Those interests may not be impaired through procedures that are fundamentally unfair or that lack reasonable procedural safeguards.

124. The Board's process is fundamentally unfair in three respects. *First*, it contains no neutral check on the reasonableness of compelled process before a penalty attaches. When the Commission or another federal agency issues a subpoena, the recipient may decline to comply and await a judicial enforcement action, in which a court decides whether the demand is reasonable before any penalty may be imposed. *See* 15 U.S.C. § 78u(c); SEC Form 1662, Part F ("If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so."); *Reisman v. Caplin*, 375 U.S. 440, 446-50 (1964); *United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950). An ABD works differently. DEI staff draft the ABD and determine in the first instance whether the witness has complied with the ABD. The Division may then recommend that the Board institute a noncooperation proceeding, which the Board adjudicates and in which the Board ultimately determines whether to impose a sanction. Board Rules 5110, 5200(a)(3), 5300(b). And the staff members who draft and issue those demands are, by statute, not officers or employees of the United States. 15 U.S.C. § 7211(b). Even when accountable government officers conduct an administrative search, the subject must "be afforded an opportunity to obtain precompliance review before a neutral decisionmaker," rather than be left to refuse "at his or her own peril." *City of Los Angeles v. Patel*, 576 U.S. 409, 420-21 (2015). That opportunity exists where the recipient of a subpoena may "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court." *Id.* at 420 (quoting *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984)). Without it, a demand regime "creates an intolerable risk that searches authorized by it will exceed statutory limits." *Id.* at 421. The Board's process affords Plaintiffs no such opportunity. Plaintiffs face compulsion without accountability. The Board mayrespond that Sarbanes-Oxley established a different enforcement architecture for Board investigations, one that substitutes Board disciplinary proceedings and

Commission review for judicial enforcement. Plaintiffs do not contend that due process requires the Board to replicate the Commission's subpoena-enforcement procedure. Plaintiffs' point is narrower: whatever enforcement architecture Congress chose, due process requires a meaningful opportunity to obtain neutral review of the lawfulness of compelled process before substantial sanctions may be imposed, and the Board's procedures, as applied here, provide no such opportunity.

125. *Second*, the Board conditions any review on the risk of ruinous sanctions. A regime that effectively conditions access to review upon risking severe sanctions raises serious due-process concerns. *Ex parte Young*, 209 U.S. 123, 147-48 (1908); *see Free Enter. Fund*, 561 U.S. at 490-91 (declining to require plaintiffs to "bet the farm" before "testing the validity of the law" (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007))). Plaintiffs should not have to bet their careers to test demands issued by private Board staff. Here, the practical path to review runs through noncompliance, an expedited noncooperation proceeding with a five-day answer deadline, and the possibility of a permanent bar from association with a registered public accounting firm. Board Rules 5110(b), 5421(b), 5300(b).

126. *Third*, each factor under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), favors Plaintiffs. Their private interests, their funds and their livelihoods, are substantial. The risk of erroneous deprivation is high because DEI staff alone determine, without prior neutral review, the place and cost of testimony and the content of required certifications. The safeguards Plaintiffs seek, remote testimony, testimony where they live, advance tender of expenses, and production without compelled attestation, would sharply reduce that risk; federal courts and the Board's own adjudicatory procedures already employ comparable safeguards. And the Board's countervailing interest is slight: the Associate Director identified no investigative necessity for requiring in-

person testimony in the United States rather than testimony by videoconference or in Country X, the Board's rules authorize sound-and-visual recording, and the cost of compensating a compelled witness is modest relative to the resources of an entity with an annual budget of approximately $362 million.

127. The Board's procedures are especially deficient because the challenged demands concern matters for which no Board rule provides meaningful standards. Neither the location of compelled testimony, the allocation of travel costs, nor the compelled execution of certifications is governed by Commission-approved standards capable of constraining Board staff discretion or providing notice to regulated persons.

128. The constitutional defect is especially acute because Plaintiffs seek neither immunity from testimony nor exemption from the Board's investigative authority. Plaintiffs do not object to providing testimony or responsive information. The dispute concerns only the conditions the Board has attached to compelled testimony and the absence of any meaningful mechanism for obtaining neutral review of those conditions before severe sanctions may be imposed.

129. Plaintiffs are entitled to a declaration that the Board's demands, that Plaintiffs fund their own compelled travel, create certifications, complete the Questionnaire, and submit to those requirements without a meaningful opportunity for neutral review violate the Due Process Clause of the Fifth Amendment. Plaintiffs are further entitled to a declaration that any noncooperation proceeding based on an allegation or implication of Plaintiffs' refusal to comply with those demands would violate due process.

**Count VI – Violation of the Due Process Clause of the Fifth Amendment**
**(Lack of Fair Notice)**

130. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 87 as if fully set forth herein.

131. This Count VI is pleaded in the alternative. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A regulation fails that requirement when it gives no fair notice of what is required or is so standardless that it authorizes or encourages arbitrary and discriminatory enforcement. *Id.* The Due Process Clause therefore prohibits an agency from imposing sanctions based on standards that regulated persons could not reasonably ascertain in advance. *Id.* The requirement applies with full force to sanctions that, like a Board bar, can end a professional career. *See id.* at 253-54.

132. Nothing in the Act, the Board's rules, or Form ENF-1 gives notice that declining to fund international travel, including intercontinental travel, or interstate travel, failing to obtain a visa that only the Department of State can grant and that no court can compel it to grant, or declining to create and sign a certification or to complete and sign the Questionnaire constitutes "noncooperation." Form ENF-1's catch-all phrase, "otherwise failing to cooperate in connection with an investigation," supplies no discernible standard for determining whether self-funded travel, visa difficulties, or refusal to create new documents constitutes sanctionable noncooperation. The Board's rules say nothing about who bears the expense of compelled testimony, whether a witness located abroad must travel to the United States, when remote testimony is permitted, whether visa-related inability to travel constitutes noncooperation, or whether a witness may be compelled to execute certifications or questionnaires.

133. The Board has left those questions to the discretion of individual DEI staff members, who by statute are not officers or employees of the United States, 15 U.S.C. § 7211(b), to be resolved on an ad hoc basis rather than pursuant to any Commission-approved standard. No statute, Board rule, Commission-approved policy, published guidance, or adjudicative decision addresses those questions, and when asked, the responsible Associate Director identified none. See supra ¶¶ 62-64. A sanction regime whose substantive content is supplied after the fact by investigating staff invites arbitrary enforcement and fails to provide fair notice of the conduct it prohibits.

134. The constitutional deficiency is especially pronounced because the Board seeks to impose professional sanctions through a standard that cannot be found in any statute, rule, form, guidance document, adjudicative decision, or other publicly available source. A regulated person reviewing the Act, the Board's rules, and Form ENF-1 would have no reasonable basis to conclude that self-funded international travel, inability to secure a visa, refusal to create new certifications, or refusal to complete the Questionnaire constitutes sanctionable noncooperation.

135. The lack of notice is particularly acute because the Board seeks to impose sanctions not for conduct traditionally understood as obstruction or noncooperation, but for Plaintiffs' assertion of legal objections to the place, cost, and form of compelled testimony. Nothing in the Act, the Board's rules, or Form ENF-1 gives fair warning that such objections may themselves be treated as sanctionable misconduct. Indeed, a regulated person reviewing the Act, the Board's rules, and Form ENF-1 would reasonably expect that noncooperation refers only to the withholding of testimony or documents, not to objections concerning the cost, location, or form of compelled testimony.

136. Plaintiffs are entitled to a declaration that the Due Process Clause prohibits the Board from imposing or threatening noncooperation sanctions based on standards that are not disclosed in the Act, the Board's rules, or Form ENF-1. Plaintiffs are further entitled to a declaration that the Board may not treat as noncooperation Plaintiffs' refusal to fund their own compelled travel, Plaintiffs' inability to obtain a United States visa, or Plaintiffs' refusal to create or sign a certification or complete the Questionnaire. Plaintiffs are also entitled to a declaration that any noncooperation proceeding based on such conduct would violate due process.

## III. ADMINISTRATIVE PROCEDURE ACT CLAIM (IN THE FURTHER ALTERNATIVE)

Count VII provides an additional, alternative framework for review of the same unlawful conduct.

### Count VII – Administrative Procedure Act, 5 U.S.C. § 706 (In the Alternative)

137. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 87 as if fully set forth herein.

138. Plaintiffs plead this Count VII in the alternative. Plaintiffs' statutory and constitutional claims do not depend upon the APA, and Plaintiffs' entitlement to relief on Counts I through VI does not turn on whether the Board is an "agency" within the meaning of the APA or whether the challenged actions constitute final agency action.

139. The Board qualifies as an "agency" for purposes of APA review, which reaches "each authority of the Government of the United States." 5 U.S.C. § 551(1). Congress provided that the Board "shall not be an agency or establishment of the United States Government," 15 U.S.C. § 7211(b), and Plaintiffs recognize that the question has not been definitively resolved. But a statutory label does not control whether an entity exercises governmental authority. *See Dep't of*

*Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 51-55 (2015) (treating Amtrak as a governmental entity notwithstanding the statutory provision that it is not a department, agency, or instrumentality of the United States Government). The Board qualifies as an agency because the Supreme Court decided *Free Enterprise Fund* on the parties' agreement that the Board is "part of the Government" for constitutional purposes, *Free Enter. Fund*, 561 U.S. at 485–86; this Court recently recognized that, "for purposes of [its] analysis, the Board is a government entity subject to the same constraints as administrative agencies," *Doe*, No. 1:24-cv-780, slip op. at 17; it exercises sovereign compulsory power delegated by Congress; its rules carry the force of federal law, 15 U.S.C. § 7202(b)(1); and its members are appointed and removable by the Commission, *id.* § 7211(e). The Board therefore functions as an "authority of the Government of the United States" within the meaning of 5 U.S.C. § 551(1), notwithstanding Congress' decision not to label it a federal agency for all purposes.

140. The Board's refusal to pay Plaintiffs' expenses or to permit alternative means of testimony, and its Certification Demands, are final agency action. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). They mark the consummation of the Board's decisionmaking on those questions: DEI, through the Associate Director, communicated the Board's definitive and unequivocal positions concerning travel, reimbursement, certifications, and compliance obligations; nothing remains for DEI or the Board to decide before the compliance dates. And legal consequences flow from them: Plaintiffs must pay, certify, and comply by fixed dates or face the risk of noncooperation sanctions. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-99 (2016) (legal consequences can exist before formal enforcement proceedings begin). These are not tentative investigative steps subject to later correction; they are fixed commands whose only alternative is sanction. *See Sackett v. EPA*, 566 U.S. 120, 126-27 (2012). No further internal

process exists through which Plaintiffs may obtain reconsideration of those determinations before the compliance deadlines expire or noncooperation consequences may attach.

141. The challenged actions are reviewable under the APA because they presently determine Plaintiffs' rights and obligations and expose Plaintiffs to noncooperation sanctions upon noncompliance. Plaintiffs need not incur sanctions, abandon their objections, or violate the challenged demands in order to obtain judicial review. *See Sackett*, 566 U.S. at 127; *Hawkes*, 578 U.S. at 600. Because no internal mechanism exists to obtain reconsideration of these determinations before the compliance deadlines expire, postponing review would effectively require Plaintiffs either to surrender their objections or to risk noncooperation sanctions.

142. The challenged actions are contrary to law and in excess of statutory authority because they conflict with Sections 105(a) and 105(b) of the Act. 5 U.S.C. § 706(2)(A), (C), and (D). The challenged actions are also arbitrary and capricious because the Board failed to consider obvious alternatives, including remote testimony and testimony in Country X; failed to address the costs imposed on compelled witnesses; departed without explanation from principles reflected in Rule 5424(a)(4) and longstanding federal practice; and demanded certifications without explaining why testimony under oath would be inadequate. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency does not engage in reasoned decisionmaking when it resolves a substantial question regarding compelled testimony without reference to any identified rule, policy, standard, evidence, or analysis. The Associate Director identified none. See supra ¶¶ 62-64.

143. Plaintiffs are entitled to a declaration that the challenged attendance, certification, questionnaire, and noncooperation demands are unlawful. 5 U.S.C. §§ 703, 706(2).

## PRAYER FOR RELIEF

144. Plaintiffs do not seek to avoid testimony, document production, or the Board's investigative authority. Plaintiffs are prepared to testify and to produce all responsive documents in their possession, custody, or control. The dispute concerns only conditions that Congress did not authorize and that the Board has imposed without Commission-approved rules or standards, including compelled self-funded travel, compelled certifications and questionnaires, and threatened noncooperation sanctions. Plaintiffs do not ask the Court to dictate a single solution. The Board may take Plaintiffs' testimony by videoconference, take it in person in Country X, or pay the costs of Plaintiffs' attendance that it compels. What the Board may not do is shift those costs to the witnesses. Absent relief, Plaintiffs must either comply with demands that exceed the Board's authority or risk professional sanctions that may substantially impair their livelihoods before any meaningful review occurs.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

(a) Declare, under 28 U.S.C. § 2201(a), that Sarbanes-Oxley § 105, 15 U.S.C. § 7215, does not authorize the Board to compel an associated person, whether residing in the United States or abroad, to travel at that person's own expense to provide testimony in a Board investigation;

(b) Declare that the Board lacks authority to compel Plaintiffs to create, prepare, execute, certify, verify, or sign written certifications, questionnaires, declarations, attestations, or other written statements for investigative purposes that do not already exist, including the Certification Demands and the Questionnaire Demand;

(c) Declare that a Plaintiff's declining to travel to the United States at personal or Firm expense while offering to testify by videoconference or in Country X, a Plaintiff's inability to obtain a United States visa, and a Plaintiff's declining to create, execute, certify, verify, sign, or complete a certification, questionnaire, declaration, attestation, or similar document do not constitute a refusal "to testify, produce documents, or otherwise cooperate" within the meaning of 15 U.S.C. § 7215(b)(3), or a failure to comply with an accounting board demand or cooperate within the meaning of Board Rule 5110;

(d) Declare that, consistent with Section 105(a), the Board may not compel Plaintiffs to appear in person in the United States for investigative testimony unless the Board through DEI (i) takes Plaintiffs' testimony by videoconference during reasonable business hours in Country X, (ii) takes Plaintiffs' testimony in person in Country X, or (iii) first tenders witness fees, travel expenses, and attendance allowances substantially equivalent to those provided under federal law for compelled witnesses and accounts for a Plaintiff's delay or inability to obtain a United States visa;

(e) Declare that the challenged demands and conditions are inconsistent with the "fair procedures" required by 15 U.S.C. § 7215(a);

(f) Declare that Plaintiffs' assertion of statutory, constitutional, and procedural objections to the challenged demands does not constitute noncooperation within the meaning of 15 U.S.C. § 7215(b)(3) or Board Rule 5110;

(g) In the alternative, declare that the Board's demands and the procedures by which the Board imposes and enforces them violate the Due Process Clause of the Fifth Amendment;

(h) In the alternative, declare unlawful, pursuant to 5 U.S.C. §§ 703 and 706(2), the Board's refusal to permit reasonable alternative means of testimony, including testimony by videoconference or in Country X; the Board's refusal to provide witness fees, travel expenses, and attendance allowances for compelled testimony; the Certification Demands; the Questionnaire Demand; and any determination, position, policy, practice, or threatened action treating Plaintiffs' refusal to fund their own compelled travel, inability to obtain a United States visa, or refusal to create, execute, certify, verify, sign, or complete a certification, questionnaire, declaration, attestation, or similar document as noncooperation;

(i) Order a speedy hearing of this declaratory-judgment action pursuant to Federal Rule of Civil Procedure 57;

(j) Award Plaintiffs their costs and reasonable attorneys' fees as permitted by law; and

(k) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: November 3, 2026

*/s/ Robert N. Driscoll*
Robert N. Driscoll (DC Bar #486451)
Alfred D. Carry (DC Bar #1011877)
Dickinson Wright PLLC
1825 I Street NW, Suite 900
Washington, DC 20006
Tel/Dickinson Wright (DC): (202) 457-0160
Tel/Driscoll: (202) 466-5955
Tel/Carry: (202) 466-5960
Fax: (844) 670-6009
rdriscoll@dwlaw.com
acarry@dwlaw.com
***Attorneys for Plaintiffs***
***Doe 1, Doe 2, and Doe 3***